The Full Commission has reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner Chrystal Redding Stanback and the briefs and arguments on appeal. Based on its assignments of error, defendant has not shown good ground to receive further evidence or to amend the prior Opinion and Award. However, based on his assignments of error, plaintiff has shown good ground to reconsider the evidence. Having reconsidered the evidence of record, the Full Commission modifies the prior Opinion and Award on the issue of plaintiff's average weekly wage and the amount of temporary partial disability compensation to which he is entitled.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 26 July 1996 and in a Pre-Trial Order as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 3 December 1992, an employer-employee relationship existed between plaintiff and defendant.
3. Plaintiff's average weekly wage on 3 December 1992 was $1041.19, which yields a compensation rate of $426.00, the maximum rate for that year.
4. The medical records stipulated into evidence include those records attached to the depositions of Dr. Roy, Dr. Denman, and, in addition, the records of Dr. David Johnston, Dr. Raymond Bianchi and Dr. Nandlal Shah.
5. The issues to be determined are if plaintiff sustained a compensable back injury on 3 December 1992, and if so, what benefits is he entitled to pursuant to the North Carolina Workers' Compensation Act?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born on 12 August 1932, and at the time of the hearing before the Deputy Commissioner was sixty-three (63) years of age. Plaintiff was employed at Carolina Freight from 27 November 1956 through 31 December 1992, at which time he took voluntary retirement.
2. At the time of his retirement, plaintiff held the position of Director of Outside Maintenance and Fuel Administration, wherein he traveled to terminals of the employer-defendant and inspected such sites. Plaintiff's job duties required him to drive 30,000 miles per year.
3. On 3 December 1992, plaintiff sustained an injury by accident within the course of his employment when he slipped and fell in a terminal in Atlanta, Georgia while on a site inspection. Plaintiff continued to work for Carolina Freight until 31 December 1992. He submitted a Form 18 reporting his injury on 23 December 1992.
4. Plaintiff originally sought chiropractic treatment from Dr. Risden Burris. In August of 1993, plaintiff was treated by Dr. Ray Burris, a chiropractor related to the other Dr. Burris.
5. On 7 September 1993, plaintiff went to Dr. David Johnston of Miller Orthopaedic Clinic. Plaintiff reported a history of his fall at work in December of 1992, plus a recent flare-up when he leaned down to pick up some boxes. Dr. Johnston diagnosed plaintiff as having degenerative disc disease; he prescribed physical therapy and ibuprofen and saw plaintiff again on 17 September 1993.
6. On 23 September 1993, plaintiff went to Dr. Nandlal Shah, a specialist in physical medicine and rehabilitation. Dr. Shah repeated the consistent medical history given by plaintiff, then diagnosed chronic low back pain secondary to right sacroiliac joint strain and degenerative disc disease. He also opined that the low back symptoms were caused by plaintiff's fall on 3 December 1992. Plaintiff did not follow up on Dr. Shah's recommendations for treatment because he did not want to spend the money on the program Dr. Shah recommended.
7. On 5 July 1994, plaintiff went to another chiropractor, Dr. Derrick Denman, complaining of pain in his back and right leg, particularly when he sat or drove too long. Plaintiff again gave the same history of having fallen at work in December of 1992. Dr. Denman treated plaintiff and opined that the problem for which he was treating him was caused by the fall at work in December of 1992. Dr. Denman was also of the opinion that the episode of lifting a box at home in 1993 did not affect the causal connection between the original, compensable injury and the condition for which he treated the plaintiff. Plaintiff was still receiving treatment on 28 September 1994, when he was involved in an automobile accident. This accident caused a temporary exacerbation of plaintiff's condition, after which his condition returned to essentially what it had been before the accident, particularly with respect to plaintiff's ability to drive. Dr. Denman opined that due to his compensable injury, plaintiff was limited to four hours per day of driving, at best, regardless of how much resting he was allowed to do, and even trips of one hour were sometimes too much.
8. Dr. Mark Roy, a neurosurgeon in Greensboro, saw the plaintiff on 20 December 1994. Plaintiff gave Dr. Roy the same history of falling at work in December of 1992 as he gave to all of the other treating physicians. After obtaining an MRI scan, Dr. Roy was able to diagnose ruptured discs at L3-4 and L4-5. He attributed the L4-5 injury to the fall at work, since it appeared to be an old herniation. The L3-4 injury appeared fresher, and Dr. Roy opined that the level might be related to the car wreck or other trauma more recent than the fall in December of 1992. The MRI scan also showed degenerative changes at L5-S1.
9. In one of two depositions, Dr. Roy clarified that his office note of 28 December 1994 was incorrect, and that he had meant to attribute both the L3-4 and L4-5 levels to the car accident, while attributing the damage at L5-S1 to the compensable fall. Dr. Roy further opined that none of plaintiff's discs were operable and recommended continuing an exercise program. Dr. Roy treated plaintiff a few more times and assigned a disability rating of twenty-one percent (21%) of the back on 1 June 1995. Only fifteen percent (15%) of the permanent partial disability rating is attributable to the compensable injury. Dr. Roy saw plaintiff several more times through July of 1996.
10. Prior to his fall, plaintiff's job had required a huge amount of driving. In his position, he supervised all maintenance outside of the headquarters in Cherryville, which required him to drive 30,000-50,000 miles each year. He drove almost every week, splitting his driving between local facilities that were no more than four or five hours each way from headquarters, and on the road facilities, for which he would fly to an airport, then drive a rented car. He was generally under a lot of time pressure, so he had to drive many hours without time to take many breaks.
11. Dr. Roy opined that it would be very difficult for plaintiff to do the amount of driving required of his job at Carolina Freight with the condition of his back at the time Dr. Roy was examining him. In Dr. Roy's opinion, sitting in a car and riding in an airplane are two of the most uncomfortable positions for patients with plaintiff's kind of back problems. Dr. Roy opined that plaintiff would be able to do the driving described for his job with Carolina Freight "if it's a matter of life or death," but "it would hurt all the time" and "would be extremely uncomfortable."
12. The medical opinions of Dr. Denman and Dr. Roy are given greater weight with respect to causation of plaintiff's injuries and his resulting disability
13. Following his retirement, plaintiff had planned to engage in the business of finding used trucks for truck companies to buy. However, in order to look for trucks effectively, plaintiff would have had to do driving in amounts similar to what he had driven at Carolina Freight, which he could not do with his back condition that was caused by his fall.
14. In early 1993, plaintiff began working on his own finding and selling trucks to various companies. While working in this capacity, plaintiff's back condition limited his ability to travel and his ability to earn wages. In addition, plaintiff spoke with representatives of Moss Trucking in March or April of 1993 about taking a job similar to the one he had occupied at Carolina Freight, but he could not take the job because he was not able to do the driving required.
15. Following his injury of December 1992, plaintiff was only able to drive about 100 miles per day, though not every day, and he felt the need to stop and stretch every 30 minutes or so. He drove between 15,000 and 20,000 miles in 1993, 1994 and 1995 which was significantly less than the miles he was able to drive before his injury. Accordingly, plaintiff's earning capacity was reduced as a result of injuries sustained in his compensable fall in December 1992, because he was unable to do the necessary driving required to earn the same or greater wages as his pre-injury wages. Due to his injuries, plaintiff was unable to perform his job at Carolina Freight, regardless of its availability, therefore plaintiff's retirement from Carolina Freight is irrelevant with respect to his earning capacity.
16. The parties have stipulated that plaintiff's average weekly wage at the time of his injury on 3 December 1992 was $1,041.19, which yields the a compensation rate of $426.00, the maximum rate for that year.
17. In 1993, plaintiff earned a profit of $515.00 from his work in finding and selling trucks. During this year, he also earned $3,971.00 in wages from his consulting work for Douglas Leonhardt and Associates and $800.00 in wages for consulting with Custom Transport Company. Additionally, in 1993 plaintiff received wages from defendant in the amount of $6,602.00. These wages from defendant were for work performed in 1992 and accrued vacation time. The total amount of wages plaintiff earned for 1993 equals $11,888.00. When averaged over a 52 week period, this total yields an average weekly wage for 1993 of $228.62.
18. In 1994, plaintiff earned $669.30 from his consulting work with Douglas Leonhardt and Associates. In his own business, plaintiff sustained a loss of $650.00 for 1994. Therefore, plaintiff's wages for 1994 were $19.30. When averaged over a 52 week period, this total yields an average weekly wage for 1994 of $.37.
19. In 1995, plaintiff earned no wages from any work outside of his own business. In his own business, plaintiff sustained a loss of $850.00 for 1995 and, therefore, earned no wages in that year.
20. In January 1996, plaintiff formed a corporation with a partner who assumed most of the driving responsibilities, and plaintiff handled office work. With this arrangement, he was able to earn a $16,000.00 profit in 1996 which generates an average weekly wage of $307.69.
21. There is no clear and competent evidence of any actual earnings for plaintiff for 1997.
22. In calculating plaintiff's wages from his own business for 1993 through the present, his company's gross revenues were not considered. Instead, based the IRS Schedule C submitted for each year, only the amount of profits plaintiff received were considered as wages.
23. Following his 3 December 1992 injury by accident and as the result thereof, plaintiff was unable to earn the amount of wages he had earned prior to his injury. The reduced wages he was able to earn beginning in 1993 were not received on a regular or weekly basis. Therefore, for the purpose of calculating the amount of temporary partial disability compensation to which he is entitled, plaintiff's yearly wages beginning in 1993 have been averaged over a 52 week period. Using this method, the amount of compensation to which plaintiff is entitled is two-thirds the difference between his average weekly wage at the time of his injury ($1,041.19) and his average weekly wage for each year thereafter. For each year, this calculation yields a figure which entitles plaintiff to the maximum compensation rate for 1992, which is $426.00.
24. As the result of his 3 December 1992 injury by accident, plaintiff is entitled to elect between receiving temporary partial disability compensation or permanent partial disability compensation. Plaintiff has elected to receive the amount of temporary partial disability compensation to which he is entitled as this is the most beneficial remedy.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 3 December 1992, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. § 97-2(6).
2. The fact of retirement has limited effect on the question of whether an employee has, in fact, sustained a loss of wage earning capacity. Stroud v. Caswell Center,124 N.C. App. 653, 478 S.E.2d 234 (1996).
3. Because the wages plaintiff earned beginning in 1993 were not received on a regular or weekly basis, for the purpose of calculating the amount of temporary partial disability compensation to which he is entitled, plaintiff's yearly wages beginning in 1993 have been averaged over a 52 week period. G.S. § 97-30. Using this method, the amount of compensation to which plaintiff is entitled is two-thirds the difference between his average weekly wage at the time of his injury ($1,041.19) and his average weekly wage for each year thereafter. Id. For each year, this calculation yields a figure which entitles plaintiff to the maximum compensation rate for 1992, which is $426.00. Id.
4. As a result of his compensable injury on 3 December 1992, plaintiff is entitled to be paid by defendant temporary partial disability compensation at the rate of $426.00 per week for the period of 1 January 1993 through the present and continuing until further order of the Commission, but subject to the statutory maximum period of 300 weeks from the date of injury. G.S. §97-30.
5. Plaintiff is entitled to payment of medical expenses resulting from his compensable injury of 3 December 1992. G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to the attorney's fee approved herein, defendant shall pay to plaintiff temporary partial disability compensation at the rate of $426.00 per week for the period of 1 January 1993 through the present and continuing until further order of the Commission, but subject to the statutory maximum period of 300 weeks from the date of injury. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum.
2. Defendant shall pay all medical expenses resulting from plaintiff's compensable injury on December 3, 1992.
3. A reasonable attorney fee of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for plaintiff's counsel. From the amounts having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to plaintiff's counsel, with plaintiff's counsel receiving every fourth check thereafter.
4. Defendant shall pay the costs.
 S/ _____________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ _____________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _____________ BERNADINE S. BALLANCE COMMISSIONER